1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2      Including Professional Corporations
   ORI KATZ, Cal. Bar No. 209561
3  okatz@sheppardmullin.com
   Four Embarcadero Center, Seventeenth Floor
4  San Francisco, California  94111
   Telephone:     415-434-9100
5  Facsimile:     415-434-3947
   AARON J. MALO, Cal. Bar No. 179985
6  amalo@sheppardmullin.com
   650 Town Center Drive, 4th Floor
7  Costa Mesa, California  92626-1993
   Telephone:     714-513-5100
8  Facsimile:     714-513-5130
   CARREN B. SHULMAN (*admitted in New York*)
9  cshulman@sheppardmullin.com
   30 Rockefeller Plaza
10 New York, New York  10112
   Telephone:     212-653-8700
11 Facsimile:     212-653-8701

12 Proposed Attorneys for Debtor

13

14            UNITED STATES BANKRUPTCY COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16                  SANTA ANA DIVISION

17

18 In re:                             | Case No. 8:10-BK-27571

19 MMFX STEEL CORPORATION OF           | Chapter 11
   AMERICA,
20                                     | **DEBTOR'S EMERGENCY MOTION FOR**
                  Debtor.              | **INTERIM AND FINAL ORDER**
21                                     | **(I) AUTHORIZING POST-PETITION**
                                       | **FINANCING AND GRANTING LIENS**
22                                     | **AND SUPER-PRIORITY CLAIMS, AND**
                                       | **(II) PROVIDING RELATED RELIEF**
23
                                       | Date:  To Be Set
24                                     | Time:  To Be Set
                                       | Place: United States Bankruptcy Court
25                                     |        411 West Fourth Street
                                       |        Santa Ana, CA 92701
26                                     |        Courtroom 5D
                                       | Judge: Hon. Robert Kwan
27

28

1    MMFX Steel Corporation of America (the "Debtor" or "Steel Corp."), moves this Court on

2    an emergency basis for entry of an order: (a) Authorizing the Debtor to incur post-petition secured

3    indebtedness (the "DIP Financing") of up to $5 million on an interim and final basis, pursuant to a

4    debtor-in-possession loan agreement (the "DIP Credit Agreement") between the Debtor and

5    Lindsey Davidson ("DIP Lender"), pursuant to Sections 105, 361, 362 and 364 of title 11 of the

6    United States Code (the "Bankruptcy Code") and Rules 2002 and 4001(c) of the Federal Rules of

7    Bankruptcy Procedure (the "Bankruptcy Rules"), and grant to DIP Lender a lien and security

8    interest (the "DIP Lien") for the benefit of the DIP Lender on all property of the Debtor (the "DIP

9    Collateral"), other than avoidance actions under Bankruptcy Code Sections 544, 545, 547, or 548;

10   and (b) Setting a final hearing on the this motion (the "Motion") at the conclusion of the interim

11   hearing.

12      It is contemplated that the DIP Loan proceeds shall be used for the benefit of the Debtor

13   and its affiliates, MMFX Technologies Corporation ("Technologies") and Fasteel Corporation

14   ("Fasteel").  The cases of the Debtor, Technologies and Fasteel (collectively, the "Debtors") have

15   not yet been jointly administered at the time of the filing of this Motion.  Accordingly, nearly

16   identical motions are being filed in the related cases of Technologies and Fasteel in order to seek

17   similar relief, because the DIP Financing is contemplated as financing for the benefit of all of the

18   Debtors.

19                                         I.

20                         NEED FOR EMERGENCY RELIEF

21      As discussed in greater detail below, the Debtors have no free cash that is

22   immediately available to them.  The Debtors are hopeful that through discussions between their

23   conflicts counsel and Wells Fargo Business Credit, a Division of Wells Fargo Bank, N.A. ("Wells

24   Fargo"), they will be able to quickly reach a stipulation regarding the use of cash collateral during

25   the course of this case.

26      As discussed below, it is uncertain whether such a stipulation will be reached and

27   whether use of cash collateral will be agreed to via stipulation.  In any event, the Debtors believe

28   that the use of cash collateral alone during the course of this case will be insufficient to fund the

-1-

1  Debtors' operations, as shown on the Budget (defined below).  Accordingly, it is critically

2  important that the Debtors obtain the immediate use of the DIP Financing in order to allow critical

3  items, such as payroll funding and expenditures on product, to be made without disruption.

4  Failure to pay those items will severely disrupt the Debtors business and jeopardize this

5  reorganization before it begins.

6      Although the Budget shows the Debtors' ending cash as positive in the first weeks

7  of these cases, when the amounts subject to Wells Fargo's security interest are removed from the

8  Budget it becomes clear that the Debtors cannot meet even their minimum obligations to

9  employees and suppliers.

10                                              **II.**

11                              **SUMMARY OF RELIEF SOUGHT**

12      The discussion in this section made in accordance with Local Bankruptcy Rule 4001-2

13  regarding post-petition financing.  The DIP Financing provides for the Debtors to borrow up to

14  $5 million, including initial advances of $1.5 million pursuant to an agreed upon budget in the

15  form attached to the DIP Credit Agreement as Exhibit A (the "Budget").

16      Importantly, although the Budget shows beginning cash of $344,224 and accounts

17  receivable of $88,347 during the first week of the case, these amounts are subject to the security

18  interest of Wells Fargo and may not be available during the course of this case.  Accordingly, it is

19  absolutely critical that the DIP Financing sought be approved.

20      As security for repayment of the DIP Loan, DIP Lender shall have a superpriority

21  administrative expense claim for Advances, pursuant to §364(c)(l) of the Bankruptcy Code

22  ("Superpriority Claim") and a senior lien on all of the personal property, tangible or intangible, of

23  the Debtors jointly and severally, including but not limited to intellectual property, but excluding

24  all equipment and accounts receivable that are currently encumbered, upon which Lender shall

25  have a secured claim junior to the pre-existing lienors.

26      The DIP Credit Agreement contains the following provisions that require disclosure

27  pursuant to the Court's local rules:

28      (1) automatic relief from stay upon default [Paragraph 13 of the DIP Credit Agreement];

1    (2) Debtors agreement not to seek or consent to any plan of reorganization or liquidation or

2    any plan of arrangement that does not provide, upon its effectiveness for full payment to the DIP

3    Lender of the DIP Loan [Paragraph 18(c) of the DIP Credit Agreement];

4    (3) restrictions on the ability of the Debtors to incur other indebtedness [Paragraph 18(c) of

5    the DIP Credit Agreement];

6    (4) restrictions on the ability of the Debtors to engage in transactions outside the ordinary

7    course of business [Paragraph 18(d) of the DIP Credit Agreement];

8    In addition, Paragraph 11 of the DIP Credit Agreement contemplates the Debtors making

9    adequate protection payments to the DIP Lender on account of the Existing Loan (defined below).

10   To the extent a separate motion authorizing those payments is not sought, the DIP Credit

11   Agreement provides for the DIP Lender to be entitled to convert a portion (equal to the amount of

12   adequate protection) of the Existing Loan into the DIP Loan, which would then make such portion

13   of the Existing Loan subject to the same protections and benefits of the DIP Loan.

14   The Debtors believe that under the circumstances of this case, as described in much greater

15   detail below, the above provisions are reasonable and necessary, and should be included in any

16   order authorizing the DIP Financing.

17                                    **III.**

18                              **BACKGROUND**

19   **A.    Corporate History and Structure of MMFX Technologies Corporation and Its**

20   **        Affiliates**

21   MMFX Technologies Corporation ("Technologies") was formed on June 22, 1998

22   for the purpose of acquiring and holding valuable patents in the field of nanotechnology.  Its first

23   acquisition was a group of patents from the University of California, Berkley in the first stock only

24   technology transfer ever made by the University.  These proprietary micro- and nano-technologies

25   enable the manipulation of the microstructures of materials (primarily steel) to obtain optimum

26   microstructural properties.  In short, as set forth in greater detail below, the technology allows

27   Technologies to produce steel ("MMFX Steel") that is stronger, more flexible, corrosion resistant,

28   ecologically sound, and economical than standard steel.

DIP FINANCING MOTION

In its effort to commercialize the technology, Technologies formed a number of subsidiaries (all referenced hereinafter as the "MMFX" or the "Company"), including the following:

- Fasteel Corporation ("Fasteel"), created in August 2000, to handle the research, development, application and testing of MMFX Steel and related materials under various conditions to test stress, corrosion and the like;

- MMFX Steel Corporation of America ("Steel Corp"), created in September 2001, to handle the fabrication and sale of concrete reinforcing steel;

- MMFX Canadian Holdings, Inc. ("Canadian Holdings"), created in March 2006, to hold 100% of the stock of certain Canadian subsidiaries, which in turn operated a steel mill in Canada and owned certain related real estate and equipment in Canada.

- MMFX International Holdings, Inc. ("MMFX International"), created in May 2008, to act as a holding company for the foreign companies, including Canadian Holdings. In May 2009, MMFX International also held 100% of the stock of MMFX Steel DMCC ("DMCC") which operates in the Middle East. DMCC was formed under the laws of the United Arab Emirates and is licensed to conduct business as a member of the Dubai Multi Commodities Center to serve and supply the Middle East region with steel products and to provide service to engineers, contractors and sales personnel throughout the region.

Currently, Canadian Holdings and MMFX International are debtors in a jointly administered bankruptcy proceeding, filed on January 5 2010, pending before this Court, under Case Nos. 10-10083-RK and 10-10085-RK and are the parent entities of Canadian subsidiaries (the "Canadian Parents"). Technologies holds seven main U.S. patents and has filed for patent protection in approximately 50 countries/regions for a total of approximately 350 patent applications relating to MMFX's steel.

Until May 2008, Technologies successfully financed its operations with $67 million in equity capital contributed by the current shareholders. MMFX operates as a consolidated business and all decision making for is centralized in Irvine, California.

**B.     The MMFX Steel Product**

MMFX Steel is five times as corrosion-resistant and up to three times as strong as conventional, or as it is commonly called in the industry, "black" steel. MMFX Steel has a completely different structure at the nano, or atomic, scale than black steel. MMFX Steel, as a result of its composition and the processes it undergoes, creates a laminated lath structure

-4-

1   resembling "plywood" at the molecular level, thus creating the structural strength present in

2   plywood as compared to natural wood. This "plywood " structure gives MMFX Steel its superior

3   strength, ductility, toughness and corrosion resistance.

4       Steel manufactured with MMFX Technologies' proprietary technology has the potential to

5   change the way the industrialized world uses steel. MMFX Steel allows high-rise construction

6   with less steel and concrete than traditional steel, which reduces construction costs and the

7   environmental impacts associated with steel and concrete production. Because MMFX Steel is

8   extremely corrosion resistant, it has the potential to greatly reduce future replacement costs. The

9   U.S. Federal Highway Administration currently estimates that it will cost $429 billion to fix the

10  infrastructure corrosion problems currently facing the United States. This amount represents

11  approximately 3.5% of the United States' GDP. MMFX Steel has the potential to significantly

12  reduce future replacement costs, resulting in substantial savings for future generations.

13      MMFX is well positioned to gain the global market's acceptance for its proprietary

14  products from nearly all important market sectors. The utility of MMFX Steel for the building of

15  infrastructure has been verified by numerous public agencies and universities. MMFX Steel's

16  characteristics have been recognized by all 50 state Departments of Transportation (the "DOTs")

17  and, most notably, by the Virginia Department of Transportation, which now mandates use of

18  MMFX Steel for all of its bridge construction. In fact 24 state Departments of Transportation

19  have approved the use of MMFX Steel for construction of bridges and highways. MMFX Steel is

20  typically produced by third party mills under contract for use by US entities due to "Buy

21  American" policies of the US state and federal government.

22      MMFX Steel is also increasingly used in the high rise construction market. Numerous

23  cities and counties in the U.S. have approved the use of MMFX Steel for high rise construction,

24  including San Diego, Long Beach, Los Angeles and Irvine, California, Seattle, Washington, Las

25  Vegas Clark County, and Miami, Orlando, and McDade counties in Florida. MMFX has also

26  gained wide acceptance in the Middle East market, particularly in Abu Dhabi due to its reclaimed

27  salty and sandy soil, which normally accelerates corrosion problems, making use of MMFX Steel

28  very attractive.

1    Currently, MMFX produces both traditional black and MMFX Steel, and is increasing its

2    market share over manufacturers of "black" steel on DOT projects. MMFX also sells its steel to

3    DMCC for the Middle East projects, as well as to third party buyers.

4    As of December 13, 2010, MMFX collectively employed approximately 30 employees

5    worldwide, of which 19 are in California. Due to the acceptance of MMFX Steel by the state

6    DOTs and MMFX's increasing market share in DOT projects, MMFX has doubled its sales from

7    September to October, and again from October to November. In November, MMFX shipped more

8    than 2,700 tons in fulfillment of sales orders of more than $4.5 million.

9    **C.      Incurrence of Debt for the Welland Mill**

10    In April, 2006, MMFX acquired a steel mill in Welland, Ontario (the "Welland Mill"),

11    along with real estate (including office space) and equipment, from entities that had no affiliation

12    to MMFX. The purchase of the Welland Mill was expected to allow MMFX to manufacture

13    MMFX Steel itself, without having to outsource any aspect of the manufacturing to a third party.

14    MMFX created Welland Real Estate Inc., ST Equipment Inc., and MMFX Steel of Canada Inc.

15    (together, the "Canadian Subsidiaries") to hold the Canadian assets, each of which was organized

16    under the laws of British Colombia.

17    Following an outlay of approximately $30 million in capital expenditures to achieve

18    commercial start-up, the Welland Mill became operational in January 2009. In order to fund part

19    of the capital expenses to achieve the commercial start up of the Welland Mill, certain MMFX and

20    its subsidiaries entered into a credit agreement dated as of May 30, 2008 with Fourth Third LLC,

21    as lender ("Fourth Third") and Welland Security Holding Corporation, as collateral agent pursuant

22    to which Fourth Third advanced a term loan in the aggregate principal amount of $55 million to

23    MMFX subsidiaries in Canada (the "Fourth Third Loan"). The Fourth Third Loan was guaranteed

24    by Technologies, Steel Corp, Fasteel, Canadian Holdings and MMFX International on an

25    unsecured basis.

26    The acquisition of the Welland Mill was financed in part by the issuance by Technologies

27    of a $5 million convertible secured note, with an additional $5 million payable at maturity to

28    Investment Funding, Inc ("Investment Funding", and the "Investment Funding Note"). The

-6-

1    Investment Funding Note was secured by all of the equipment, machinery and trade fixtures at the

2    Welland Mill.

3          In the Fall of 2008, an unanticipated and disastrous series of events began which led to the

4    collapse of worldwide markets in nearly every industry, including manufacturing, construction and

5    retail sales.   Public and private construction projects in the United States and abroad came to a

6    halt and suddenly no one was in the market for steel, but for a few projects nearing completion.

7    Production at the Welland Mill ceased in June 2009 and the mill was idled.   During the period

8    from January to September 2009, the Welland Mill sold off 11,481 tons of black and MMFX Steel

9    billet to DMCC, MMFX Steel and third party buyers, resulting in revenues of approximately

10   CAD$4,400,000.

11   **D.      MMFX's Reasons for Filing**

12          MMFX's current financial crisis is attributable primarily to a combination of market

13   factors.   The global financial crisis, which remains most severe in the real estate sector, has

14   significantly reduced demand for new construction for high-rise buildings.   The absence of new

15   construction projects directly affects the demand for steel.   The decrease in the demand for steel

16   led in turn to the unanticipated and precipitous decline in the market price of steel, which has

17   declined by more than 50% in the last 12 months.   Most traditional steel mills in North America

18   are operating at 50% capacity.   Other factors which have depressed domestic steel prices in the

19   last several years are first, the availability of inexpensive foreign steel and second, the surplus of

20   inventory currently held by consumers and steel service centers.

21          Given the lack of orders, the Welland Mill was temporarily idled in June 2009 to reduce

22   indirect overhead costs.   The paucity of orders for steel left the Canadian Subsidiaries without the

23   cash flow necessary to service both the $60 million in secured loans and their operations.

24          In or about August 2009, MMFX was in breach of a covenant under the Fourth Third Loan

25   and after several failed attempts at renegotiating the loan, MMFX sought bankruptcy protection in

26   Canada on January 6, 2010 under the Companies Creditors Arrangement Act ("CCAA") for the

27   Canadian Subsidiaries.   MMFX also filed the cases for the Canadian Parents before this Court.   At

28

W02-WEST:3MAW1\403146697.1                                                      DIP FINANCING MOTION

1  the time of the CCAA proceeding, the total outstanding debt to Fourth Third was $55,000,000 in

2  principal, plus $3,169,000 in accrued interest.

3       Shortly after the commencement of the CCAA, in March, 2010, MMFX entered a debtor-

4  in-possession financing agreement with Fourth Third (the "Canadian DIP Loan") to borrow

5  sufficient funds to run a sale process for the assets of the Canadian Subsidiaries (the "Canadian

6  Asset Sale").  The sale auction occurred on July 20, 2010, and Fourth Third was the successful

7  bidder after entering a credit bid of CAD $32,800,000 (the "Credit Bid").  At the time of the sale,

8  the Canadian DIP Loan was CAD $3,800,000.

9       With the assets of the Canadian Subsidiaries sold to Fourth Third, the security for the

10 Fourth Third Loan and the Investment Funding Note was gone.  Fourth Third is left with an

11 unsecured claim against the guarantors, Technologies, Steel Corp and Fasteel, for the balance of

12 its debt, and Investment Funding with an unsecured claim against Technologies for the amount of

13 its debt.

14      Following the closing of the Canadian Asset Sale, Fourth Third asserted a deficiency claim

15 against MMFX in an amount in excess of $49 million, significantly more than the outstanding

16 debt to Fourth Third after application of the Credit Bid and payment of the Canadian DIP Loan.

17 MMFX disputes the claim and filed an objection to Fourth Third's proof of claim in the MMFX

18 International case, which includes an objection on the basis that a certain "Make-Whole Premium"

19 of over $13 million triggered upon the filing of the MMFX International case violates the

20 Bankruptcy Code and related case law.

21      On or about August 25, 2010, Investment Funding obtained a Temporary Protective Order

22 in a proceeding encaptioned Investment Funding Corporation v. MMFX Technologies

23 Corporation, pending in the California Superior Court in and for the County of San Diego, Case

24 No. 37-2010-00098635-CU-BC-CTL.  Investment Funding asserts that it has a lien over the assets

25 of Technologies and seeks payment of $5 million, plus a $5 million premium.

26      On or about October 20, 2010, Fourth Third obtained a right to attach order in a

27 proceeding encaptioned Fourth Third, LLC v. MMFX Technologies Corporation, pending in the

28

1  Superior Court of California in and for the County of San Diego, Case No. 37-2010-00102068-

2  CU-CO-CTL.  Fourth Third asserts that it has a lien over assets of MMFX.

3         In order to give MMFX, Investment Funding and Fourth Third the flexibility to negotiate

4  the terms of an appropriate resolution to claims, on or about November 17, 2010, the parties

5  entered a lien release agreement (the "Lien Release Agreement") whereby Investment Funding and

6  Fourth Third agreed any alleged liens will be deemed released automatically upon the filing by

7  MMFX on or before December 14, 2010 of a voluntary petition for relief under chapter 11 title 11

8  of the United States Code (the "Bankruptcy Code"), if at the time of such filing, no other liens

9  shall have attached to MMFX assets, and MMFX shall have taken no action to increase the

10  amount of any secured debt.  MMFX meets each of these conditions.  In addition, both Fourth

11  Third and Investment Funding have agreed to forbear through and including December 13, 2010

12  from exercising any rights and remedies it may have against MMFX.

13         Between November 17, 2010, and December 14, 2010, MMFX pursued opportunities to

14  pay off Fourth Third and Investment Funding and has presented opportunities as they arise to

15  those parties, which include payment of the true amount of the debt to Fourth Third and

16  Investment Funding, plus a capital infusion and retention of some equity for current shareholders.

17  Simultaneously, Fourth Third presented a confidential term sheet with economic terms that were

18  less desirable than other offers.  Additionally, in the past few days, MMFX has begun to receive

19  expressions of interest in licensing of the technology for MMFX Steel that, if successful, would

20  allow MMFX to repay the debt of Fourth Third and Investment Funding.

21         With no final deal in place, and the approaching deadline under the Lien Release

22  Agreement, MMFX has no choice but to file for protection under the Bankruptcy Code in order to

23  ensure that it is able to take advantage of the highest and best offer for the creditors of the estate,

24  as well as the equity holders.

25  **E.      Key Agreements With Adelphia and Wells Fargo**

26         Certain of the Debtors are parties to key agreements with Adelphia Metals, LLC and Wells

27  Fargo Bank.  Those agreements are summarized below.

28

1.    **Agreement with Adelphia**

As part of Steel Corp.'s usual sales fulfillment process, Steel Corp. purchases concrete reinforcing steel from Cascade Steel Rolling Mills ("Cascade"), which operates out of McMinville, Oregon. Steel Corp. receives the steel from Cascade in Steel Corp.'s Longview, Washington steel processing plant (the "Longview Facility") and works with that material to turn it into products ordered by Steel Corp.'s customers ("Products"). Steel Corp. entered into the Sales Order Assignment Agreement (the "Agreement") with Adelphia Metals, LLC ("Adelphia") in order to obtain the working capital it needs to satisfy customer orders for Product.

29.    Steel Corp. receives Sales Orders ("SO's") for Product from its customers. Under the terms of the Agreement, Steel Corp presents to Adelphia those of the SO's that are available for assignment. To the extent that Adelphia approves the SO's (and the Agreement does not identify what criteria should be consulted in determining which SO's are approved) Steel Corp. assigns the SO's to Adelphia pursuant to a form document, and Steel Corp is obligated to inform the customer that: (1) the assignment occurred; and (2) Adelphia will be invoicing the customer for the Product it ordered from Steel Corp.

30.    Despite the above-referenced assignment, Steel Corp. remains responsible for fulfilling the SO's and delivering the Product to customers. Steel Corp. is also required to negotiate with Cascade for the purchase of such steel materials as are required for Steel Corp. to satisfy each assigned SO, and upon the completion of that negotiation process, Adelphia issues a Purchase Order to Cascade ("Cascade PO") to cover the materials identified by Steel Corp. Adelphia pays for the materials described in each Cascade PO by wire transfer approximately four weeks before Cascade manufactures the materials ordered by Steel Corp.

31.    Steel Corp. receives the materials produced by Cascade in the Longview Facility. At the Longview Facility such materials as have been purchased to satisfy the SO's are segregated from the rest of Steel Corp's materials, and are marked as owned by Adelphia. Despite this, Steel Corp. processes the materials in order to generate the Product required to satisfy the SO's.

32.    Adelphia invoices Steel Corp.'s customers directly for the Product they order, on net 30 terms. As noted above, Steel Corp is responsible for receiving the materials needed to

-10-

1   generate this product, processing those materials, and delivering the Product to customer.  In

2   return for these services, Adelphia pays Steel Corp 95% of the SO price, reduced by the cost of the

3   Cascade PO generated in connection with the satisfaction of that SO.

4       **2.**    **The Agreement with Wells Fargo**

5          Steel Corp. and Wells Fargo entered into that certain Account Purchase Agreement (the

6   "Agreement") on or about January 10, 2008.  Pursuant to the Agreement, Steel Corp. sells certain

7   acceptable accounts receivable to Wells Fargo with limited recourse obligations.  The Agreement

8   provides that Wells Fargo will pay Steel Corp. a price for each sold account that represents 80% of

9   the face value of the account, adjusted downward by a specified percentage that varies based upon

10   the total volume of accounts Steel Corp. sells to Wells Fargo during the preceding 2 month period.

11   At the high end (in the event that the 2 month period resulted in the sale of less than $1,000,000)

12   the discount applied to the purchase price is 1.00% for accounts that are 20 days old or less, with

13   an additional .05% discount applied to the purchase price for accounts 21 days old and over.  At

14   the low end (if Steel Corp. sells more than $3,000,000 in accounts to Wells Fargo during any

15   given two month period) the discount applied to the purchase price paid to Steel Corp. is reduced

16   to .67% for accounts that are 20 days old or less, and a slightly higher discount is applied to

17   accounts that are 21 or more days old.  Payments owed to Steel Corp. under the Agreement are

18   due and payable upon completion of each assignment to Wells Fargo.

19          Wells Fargo has filed a UCC financing statement covering various collateral, including

20   Steel Corp.'s accounts and accounts receivable, in connection with the Agreement.

21   **IV.**

22   **BACKGROUND REGARDING DIP LENDER**

23          DIP Lender is currently a party to two pre-petition loan agreements: (i) that certain 12%

24   secured note, dated August 1, 2010 in the original principal amount of $400,000, and (ii) that

25   certain 12% secured note dated October and November 2009 in the original principal of amount of

26   $500,000, DIP Lender's portion of which is $50,000, which loans are secured by certain of the

27   Debtors' inventory and equipment, and pursuant to which Lender is entitled to monthly payments

28   of $4,500.00 for interest (the "Existing Loan").

-11-

DIP Lender is a shareholder of MMFX Technologies, holding 2.97% of the common shares of MMFX Technologies. DIP Lender is not, and never has been, an officer, director or person in control of any of the Debtors, and is thus not an "insider" of the Debtors under the Bankruptcy Code.

## V.

### THE REQUEST FOR DIP FINANCING SHOULD BE GRANTED

The Debtors' successful prosecution of these bankruptcy cases depends in part on the Debtors' ability to successfully recapitalize and reorganize during the course of this case, which in turn depends on its ability to demonstrate to existing and potential customers, suppliers, vendors and other contract counter-parties that the Debtors have adequate means to operate during the administration of these chapter 11 bankruptcy cases. Unless the interim financing becomes available as set forth in the Budget, the Debtors will suffer irreparable harm as it will be at risk of not meeting their critical obligations to third parties. Such a failure would in turn force the Debtors to cease operations and liquidate immediately. The DIP Financing is further necessary to avoid the perception by third parties that they hold undue leverage over the Debtors in normal business negotiations due to the Debtors' liquidity crisis.

The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of new indebtedness is vital to the Debtor. The preservation and maintenance of the going concern value of the Debtors is integral to a successful reorganization or other transaction.

The Debtors were unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, notwithstanding extended negotiations with third parties over an extended period of time. As a result, all efforts were focused on obtaining the DIP Financing currently sought. The DIP Financing offered by the DIP Lender is the Debtors' only realistic alternative to obtain post-petition credit.

The terms of the DIP Facility are contained in the DIP Credit Agreement, and its key provisions (along with the Interim DIP Order's key provisions) are summarized above.

The statutory requirement for obtaining post-petition credit under section 364(c)(2) of the Bankruptcy Code is a finding, made after notice and hearing, that the Debtor is "unable to obtain

1   unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." A Section 364(c)

2   financing facility is appropriate when the trustee or debtor in possession is unable to obtain

3   unsecured credit allowable as an ordinary administrative claim. *In re Crouse Group, Inc.*, 71 B.R.

4   544, 549, modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (secured credit under

5   section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit

6   cannot be obtained).

7          Courts have articulated a three-prong test to determine whether a debtor is entitled to

8   obtain financing under section 364(c) of the Bankruptcy Code, namely that:

9                 a.      the debtor is unable to obtain unsecured credit under section 364(b), i.e., by

10   allowing a lender only an administrative claim;

11                 b.      the financing is necessary to preserve the assets of the estate; and

12                 c.      the terms of the financing are fair, reasonable and adequate, given the

13   circumstances of the debtor-borrower and the proposed lender.

14          The Debtors were unable to procure adequate post-petition credit in the form of unsecured

15   credit or unsecured debt with an administrative priority. The circumstances of this case, described

16   in detail above, require the Debtors to obtain credit under Bankruptcy Code sections 364(c), and

17   make the DIP Lender the only logical choice for financing. Therefore, the Debtors believe that

18   this Court should authorize the Debtors to obtain the post-petition DIP Financing to the extent and

19   pursuant to the terms contained herein, in the DIP Credit Agreement, and the proposed Interim

20   DIP Order attached to this Motion as Exhibit B.

21          After determining that post-petition credit was available only under Bankruptcy Code

22   section 364(c), the Debtors negotiated the DIP Credit Agreement at arm's length and pursuant to

23   its business judgment, which is to be accorded deference so long as it does not run afoul of the

24   provisions of and policies underlying the Bankruptcy Code. *See, e.g., Bray v. Shenandoah Fed.*

25   *Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-

26   in-possession financing necessary to sustain seasonal business); *In re Ames Dept. Stores, Inc.*, 115

27   B.R. 34, 40 (S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section

28   364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long

-13-

1  as the credit agreement does not contain terms that leverage the bankruptcy process and powers or

2  its purpose is not so much to benefit the estate as it is to benefit parties in interest").

3          Bankruptcy courts routinely defer to the debtor's business judgment on most business

4  decisions, including the decision to borrow money. *See Group of Institutional Investors v.*

5  *Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444,

6  449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this

7  Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

8          In general, a bankruptcy court should defer to a debtor in possession's business judgment

9  regarding the need for and the proposed use of funds, unless such decision is arbitrary and

10 capricious. *See In re Curlew Valley Assoc.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).  Courts

11 generally will not second-guess a debtor in possession's business decisions when those decisions

12 involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of

13 [its] authority under the Code." *Id.* at 513-14 (footnotes omitted).

14         The Debtors have exercised sound business judgment in determining that the DIP

15 Financing is appropriate as proposed, and has satisfied the legal prerequisites to borrow and incur

16 the indebtedness requested.  The interest and fees to be paid, the amount to be borrower and the

17 terms of repayment, are all fair and reasonable under the circumstances, and represent the best

18 option available for the Debtors.

19         The Debtors additionally request that the Court order that the security interests and liens

20 granted for the benefit of the DIP Lender be deemed to constitute enforceable, valid and duly

21 perfected security interests and liens without the filing or recordation of financing statements,

22 mortgages, notices of lien or similar instruments in any jurisdiction or taking of any other action in

23 order to validate or perfect the security interests and liens granted, and that such security interests

24 and liens be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to

25 challenge, dispute or subordination as of the time and date of entry of the proposed Interim DIP

26 Order.

27         The Debtors further request that the automatic stay provisions of Section 362 of the

28 Bankruptcy Code be vacated and modified to the extent necessary so as to permit the DIP Lender

1  to exercise, upon the occurrence of an event of default (as defined in the DIP Credit Agreement)

2  and the giving of notice, written or otherwise, to the Debtor, all rights and remedies provided for

3  in the DIP Credit Agreement and the proposed Interim DIP Order as entered by the Court, as well

4  as further to evidence and provide notice of the liens granted by the Debtor and approved by the

5  Court.

6                                              **VI.**

7                                            **NOTICE**

8          Copies of this Motion were provided via email, FedEx or fax (all as indicated on the

9  concurrently filed certificate of service) to the following parties:  (i) the DIP Lender; (ii) the

10  United States Trustee; (iii) the twenty largest unsecured creditors of the Debtors; (iv) other parties

11  with liens or security interests of record; and (v) certain other significant parties in interest and

12  their counsel, including the 20 largest unsecured creditors.  As soon as the Court sets a hearing on

13  the Motion, the Debtor will promptly notify the above parties of the date, time, and location of the

14  hearing.  Under the circumstances, the Debtor believes that such notice is sufficient and proper.

15                                             **VII.**

16                                        **CONCLUSION**

17          For all of the reasons set forth above, the Debtor respectfully requests that the Court:

18  (1) enter the Interim DIP Order, (2) set a final hearing on the Motion, and (3) grant such other and

19  further relief as the Court deems appropriate.

20  Dated:  December 14, 2010

21                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

22

23                              By        */s/ Ori Katz*

24                                            ORI KATZ

25                                      Attorneys for Debtor,
                                MMFX STEEL CORPORATION OF AMERICA

26

27

28

# EXHIBIT A

## LOAN AGREEMENT

THIS AGREEMENT, dated as of December 13, 2010, is between MMFX TECHNOLOGIES CORPORATION, a California corporation, MMFX Steel Corporation of America, a Nevada corporation, and Fasteel Corporation, a California corporation ("**Borrowers**") and Lindsey Davidson, as Trustee of the Lindsey Davidson Trust dated April 28, 2009, with address at 4427 La Orilla, Rancho Santa Fe, CA 92067 ("**Lender**").

## RECITALS

A.    WHEREAS, Borrowers are or will be debtors-in-possession under title 11 of the United States Code (the "**Bankruptcy Code**"), Central District of California Bankruptcy, and will need post-petition financing without which they will suffer immediate and irreparable harm, for additional working capital to fund their operations; and

B.    WHEREAS, Borrowers contemplate a recapitalization pursuant to a Chapter 11 Plan; and

C.    WHEREAS, Lender is willing to advance a loan not to exceed a maximum principal amount of $5,000,000, pursuant to the terms of this Agreement and related documents referred to herein (the "**DIP Loan**"); and

D.    WHEREAS, any Advances (as defined below) made under this Agreement shall be evidenced by a Revolving Promissory Note of even date herewith made by Borrowers in favor of Lender in the original principal amount of $5,000,000 (as amended, restated, supplemented, modified, extended, or renewed from time to time, the "**Note**", and together with this Agreement, collectively, the "**Loan Documents**"); and

E.    WHEREAS, other than the financing pursuant to the post-petition financing proposed hereunder, Borrowers have been unable to obtain additional needed unsecured credit, allowable



as an administrative expense under § 503(b)(1) of the Bankruptcy Code, or sufficient secured

credit secured by a junior security interest on encumbered property of the estate under

§ 364(c)(3) of the Bankruptcy Code, or a senior security interest on unencumbered property of

the estate under § 364(c)(2), and Borrowers believe that they cannot obtain credit from any other

lender on terms better than those set forth in this Agreement; and

F.     WHEREAS, Borrowers, in order to satisfy their need for post-petition financing, desire to

borrow up to $5,000,000 and obtain Advances from Lender, which Advances shall be made

pursuant to the terms of this Agreement and the other Loan Documents; and

G.     WHEREAS, Lender is currently party to two pre-petition loan agreements:  (i) that

certain 12% secured note, dated August 1, 2010 in the original principal amount of $400,000,

and (ii) that certain 12% secured note dated October and November 2009 in the original principal

of amount of $500,000, Lender's portion of which is $50,000, which loans are secured by certain

of the Borrowers' inventory and equipment (a list of such inventory and equipment are attached),

and pursuant to which Lender is entitled to monthly payments of $4,500.00 for interest

("Existing Loan").

H.     WHEREAS, the parties anticipate recapitalization of Borrowers, and the financing

contemplated herein is necessary to effectuate such recapitalization.

2.



## AGREEMENT

NOW THEREFORE, the parties enter into the following agreement:

1.    Recitals Incorporated. The foregoing recitals are hereby acknowledged as true and

correct.

2.    Loan Advances. Subject to the provisions of **Section 5**, Lender shall advance (each such

extension of credit being herein called an **"Advance"** and collectively, the **"Advances"**) to

Borrowers up to the principal amount of $1,500,000, not to exceed $400,000 in any one month.

The Lender may advance to Borrowers more than $1,500,000 under this Agreement, in the

Lender's discretion, up to a maximum of $5,000,000. Interest of 12% per annum shall be

charged against Advances, calculated on the basis of a 360-day year and actual days elapsed, and

payable 2% as a coupon (the "Coupon Interest") and 10% accrued and payable upon Termination

(the "Accrual Interest"). The Coupon Interest shall be payable monthly in arrears on the last

business day of each calendar month.

3.    Loan Documents. Any Advances made hereunder shall be subject to the terms of the

Loan Documents and the order of the Bankruptcy Court approving the DIP Loan.

4.    Lender Records. The amount of each Advance shall be recorded on the books and

records of Lender, and such record shall constitute proof of such Advance, and shall be

admissible in evidence on such issue.

5.    Borrower's Business Operations. Borrowers shall operate their businesses pursuant to

the budget attached hereto as Exhibit A (the **"Budget"**), and may use the Advances for the

purposes described in and up to the amounts listed in the Budget (or according to deviations from

the Budget approved by Lender in its sole discretion).

3.



6.     <u>Use of Borrowers' Office Space and facilities by Lender.</u>  As and for additional

consideration for this Agreement, Borrowers agree that Lender may, from time to time, utilize

Borrowers' office space and facilities, wherever located, to provide such assistance to the

Borrowers as Lender deems advisable and for related activities.  Any such use shall be incidental

to the Lender's loan and shall not obligate Lender to any obligations for rent that Borrowers owe

to any third party.

7.     <u>Closing Fee.</u> The Borrowers shall pay the Lender a non-refundable, fully-earned closing

fee of $25,000, which shall be due and payable to the Lender upon the issuance by the Court of

an order of the Bankruptcy Court approving the DIP Loan.

8.     <u>Cost of Loan.</u>  As and for additional consideration for this Agreement, Borrowers agree

that Lender is entitled to be reimbursed for its reasonable legal fees and expenses in connection

with offering and enforcing the DIP Loan up to an aggregate amount of $100,000, payable out of

Advances, if elected by Lender.  All such legal fees and expenses, if not immediately paid by the

Borrowers upon demand, shall be secured by the DIP Loan.

9.     <u>Grant of Post-petition Superpriority Administrative Expense Claim.</u>  As security for

repayment of the DIP Loan, Lender shall have a superpriority administrative expense claim for

Advances, pursuant to §364(c)(l) of the Bankruptcy Code ("Superpriority Claim").  The

Superpriority Claim shall include all personal property, tangible or intangible, of the Borrowers

jointly and severally, including but not limited to intellectual property, but excluding all

equipment and accounts receivable that are currently encumbered, upon which Lender shall have

a secured claim junior to the pre-existing lienors.

4.



10.    <u>Carve Out</u>.  The loan shall be subject to a carve out for the attorneys' fees and expenses of Borrowers' counsel and the Office of the U.S. Trustee (the "Carve Out").  For the sake of clarity, in the event the DIP Loan is terminated, or there are insufficient funds to repay the DIP Loan in full, the Carve Out shall not be subject to recovery.

11.    <u>Existing Loan</u>.  Either Borrowers will file a motion in the bankruptcy cases seeking authority to make adequate protection payments to Lender on account of the Existing Loan, or the payments that would have been adequate protection payments will be used to fund the DIP Loan and Lender shall be entitled to convert that portion of the Existing Loan into the DIP Loan subject to superpriority status.

12.    <u>Termination</u>.  This Agreement shall terminate upon the earliest of: (1) the occurrence of any material breach of its terms by Borrowers, including a breach of any of the terms of the associated Loan Documents; (2) the closing of a sale of all or substantially all of the assets of Borrowers pursuant to a sale under Section 363 of the Bankruptcy Code; (3) the effective date of a confirmed Chapter 11 plan of reorganization; (4) the conversion of Borrowers' bankruptcy case from a case under Chapter 11 to a case under Chapter 7 of the Bankruptcy Code; or (5) the dismissal of Borrowers' bankruptcy case (the earliest such event or date, referred to herein as the "Termination Date").

13.    <u>Effect of Termination.</u>  If the DIP Loan is terminated, except upon the effective date of a confirmed plan of reorganization, Lender shall have an immediate right to relief from the automatic stay, and Lender shall have no further obligation to Borrowers and any Advances then outstanding shall be immediately due and payable.

14.    <u>Conditions to Advances under the DIP Loan.</u>

5.



(a) Bankruptcy Court Order, in form and substance satisfactory to the Lender, in Lender's sole discretion, in respect of the approval of this DIP Loan and creation of the court-ordered super priority security interests provided for herein shall have been made by the Bankruptcy Court.

(b) No Event of Default shall have occurred or be continuing

(c) The Termination Date shall not have occurred.

15.   <u>Binding Effect.</u>  This Agreement shall be binding upon Borrowers and Lender, their respective successors, assigns and heirs, including any subsequent trustee for Borrowers in reorganization or otherwise, and shall inure to the benefit of Borrowers, Lender and their respective successors, assigns and heirs except that Borrowers may not assign or transfer their rights hereunder without the prior written consent of Lender, which consent may be withheld or granted, in Lender's absolute discretion.  The terms of this Agreement shall be valid and enforceable obligations of Borrowers, and all such obligations and the security interests, liens, rights and privileges granted to Lender survive the termination of this Agreement, the appointment of a trustee for Borrowers in reorganization or otherwise, conversion of the bankruptcy cases to cases under Chapter 7, and the confirmation of a Chapter 11 plan of reorganization.  If any or all of the provisions of this Agreement are hereafter modified vacated or stayed by subsequent agreement, such action shall not affect the priority, validity, enforceability or effectiveness of any lien, security interest, priority or claim agreed to herein with respect to the obligation arising in the Loan Documents incurred by Borrowers prior to the effective date of such subsequent agreement.



16.    <u>Reasonableness of Terms.</u>  The terms of the DIP Loan are fair and reasonable, were

negotiated by the parties at arm's length and in good faith, and are the best terms available to

Borrowers under present market conditions and Borrowers' financial circumstances.  Any credit

extended under the DIP Loan by Lender is extended in good faith, as that term is used in

Section 364(e) of the Bankruptcy Code.

17.    <u>Representations and Warranties.</u>  It is acknowledged that each party has read this

Agreement and has consulted counsel, or knowingly chose not to consult counsel, before

executing the same; each party has relied upon their own judgment and/or that of their counsel in

executing this Agreement and has not relied on or been induced by any representation, statement

or act by any party that is not referred to in this instrument; each party enters into this Agreement

voluntarily, with full knowledge of its significance; and the Agreement is in all respects

complete and final.  Each Borrower represents and warrants to the Lender that: it is a corporation

duly incorporated, organized and validly existing under the laws of its jurisdiction of

incorporation; it has all requisite power and authority to enter into and perform its obligations

hereunder; and its execution and delivery hereof and the performance of its obligations

hereunder have been duly authorized by all necessary action.

18.    Covenants by Borrowers. The Borrowers covenant and agree that:

      (a) they shall comply with all laws, rules, regulations and orders applicable to them

          and their assets;

      (b) they shall maintain in good standing at all times all insurance coverage as is

          customarily carried by companies which are engaged in the same or similar



business to the business of the Borrowers or as may be reasonably required by the Lender;

(c) they shall not seek or consent to any plan of reorganization or liquidation or any plan of arrangement that does not provide, upon its effectiveness for full payment to the Lender of the DIP Loan;

(d) the Borrowers shall not incur any indebtedness other than as permitted by the Lender in writing, unless such indebtedness shall be subordinate to the indebtedness in favor of the Lender under the DIP Loan or indebtedness for working capital purposes in the ordinary course of the Borrower's business.

(e) the Borrowers shall not merge, amalgamate, consolidate, reorganize, or sell any assets or license any technology outside of the ordinary course of business, unless permitted in writing by the Lender, or unless such transaction contemplates that the DIP Loan shall be repaid as part of such transaction; and

(f) the Borrowers shall permit the Lender, its representatives and agents, to have access, during normal business hours and subject to reasonable time, to the books, records, property and premises of the Borrowers.

19. <u>Reporting Covenants.</u> The Borrowers shall deliver to the Lender:

(a) Weekly and updated Budgets in form and substance satisfactory to and approved by the Lender;

8.



(b) Prompt notice of any breach of covenant or other obligation of the Borrowers under or in connection with this DIP Loan;

(c) The Borrowers shall promptly, upon receipt, deliver to the Lender copies of all pleadings, motions, applications, judicial information, financial information, and other documents filed by or on behalf of the Borrowers with the Bankruptcy Court.

(d) Such further reports and information as the Lender may reasonably request from time to time.

20.   <u>Events of Default.</u> The occurrence of any one or more of the following events shall constitute an Event of Default:

(a) The non-payment of any costs or any other amount under the DIP Loan past ten (10) business days of its due date.

(b) Any Bankruptcy Court order which materially, adversely affects the DIP Loan or the Lender's rights, remedies, liens, priorities, benefits and protections under any or all of the Bankruptcy Court orders or the DIP Loan.

Upon the occurrence of an Event of Default and after the Termination Date, any right of the Borrowers to receive any advance or other accommodation of credit from the Lender shall be immediately terminated, except the right to payment of the Carve Out, and any further advances made, if any, thereafter shall be in the sole discretion of the Lender. Upon the occurrence of an Event of Default, amounts owed by Borrowers to the Lender, shall become immediately due and payable, and the Lender shall have the right to exercise all remedies under applicable law,

9.



including, without limitation, the right to realize on all collateral, without the necessity of obtaining relief or order from any court.

21.    Indemnification. The Borrowers indemnify and hold harmless the Lender, their affiliates and their officers, directors, employees, agents and advisors (each, an "**Indemnified Person**") from and against any and all suits, actions, proceedings, orders, claims, damages, losses, liabilities and expenses (including legal fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as a result of or in connection with credit having been extended, suspended or terminated under or in relation to the DIP Loan, or the use of the proceeds thereof, and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and any actions or failures to act in connection therewith, including the taking of any enforcement action by the Lender and its representatives, and including any and all environmental liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties hereto, except to the extent that the suit, action, proceedings, orders, claims, damages, losses, liabilities and expenses arose directly from the gross negligence or willful misconduct of the Indemnified Person. All such indemnified amounts, if not immediately paid by the Borrowers upon demand, shall be secured by the DIP Loan.

22.    Amendment of Agreement. This Agreement shall not be amended except by a writing signed by all parties.

10.



23.  <u>Applicable Law and Jurisdiction.</u> This agreement shall be governed by and interpreted in accordance with internal laws in the State of California, without regard to its conflicts of law rules.

24.  <u>Entire Agreement.</u> This Agreement (together with the associated Loan Documents) sets forth the entire agreement between the parties, and there are no other agreements or understandings between them related to this DIP Loan.

25.  <u>Execution by Facsimile Signatures and in Counterparts.</u> The parties agree that facsimile signatures or signatures delivered by any other electronic means shall have the same force and effect as original signatures. This Agreement may be executed in one or more counterparts, each counterpart to be considered an original portion of this Agreement.

26.  <u>Notices.</u> All notices and demands hereunder shall be in writing and shall be deemed given when addressed as follows: on the earlier of (a) when they are actually delivered to the addressees by facsimile transmission or otherwise, or (b) at 11:00 a.m. California time on the business day next following the deposit thereof with any recognized national overnight delivery service properly addressed to the parties as set forth below:

| | |
|---|---|
| If to Borrower: | MMFX Technologies Corporation |
| | 2415 Campus Drive, Suite 100 |
| | Irvine, CA 92612 |
| | Attn: President |
| | Fax: 949-474-1130 |
| | |
| | MMFX Steel Corporation of America |
| | 2415 Campus Drive, Suite 100 |
| | Irvine, CA 92612 |
| | Attn: President |
| | Fax: 949-476-7600 |

11.

Fasteel Corporation
2415 Campus Drive, Suite 100
Irvine, CA 92612
Attn:  Corporate Secretary
Fax:  949-476-7600

with a copy to:    Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza, 24th Floor
New York, NY 10112
Attn:  Carren Shulman, Esq.

If to Lender:    Lindsey Davidson, Trustee
Lindsey Davidson Trust dated April 28, 2010
4427 La Orilla, Rancho Santa Fe, CA 92067
US Mail: PO Box 2342
Fax: 858-756-1532

with a copy to:    Robert Pizzuto
401 B Street, Suite 2400
San Diego, CA 92101
Facsimile   (619) 239-1719

27.    <u>Bankruptcy Court Approval.</u>  This Agreement is subject to Bankruptcy Court approval, upon notice and hearing as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of Bankruptcy Procedure of the Bankruptcy Court for the District where the bankruptcy filings are made.

28.    <u>Headings.</u>  Paragraph headings in this Agreement are included herein for convenience of reference only, and shall not constitute a part of this Agreement for any other purpose.

12.



IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

BORROWER:

MMFX TECHNOLOGIES
CORPORATION

By: _____
Its: _____

BORROWERS:

MMFX STEEL CORPORATION OF
AMERICA

By: _____
Its: _____

BORROWERS:

FASTEEL CORPORATION

By: _____
Its: _____

LENDER

LINDSEY DAVIDSON TRUST dated
April 28, 2009

By: _____
Its: _____

W02-EAST:7CBS1\200363172.1

# EXHIBIT A TO LOAN AGREEMENT

**MMFX U.S. CASH FORECAST**

12/14/2010

| Friday Ending: | 12/19 | 12/26 | 1/2 | 1/9 | 1/16 | 1/23 | 1/30 | 2/6 | 2/13 | 2/20 | 2/27 | 3/6 | 3/13 | 3/20 | 3/27 | 4/3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bank Balances** | | | | | | | | | | | | | | | | |
| Total account banks as of 12/13 | | | | | | | | | | | | | | | | |
| 7063290204 | 22 | | | | | | | | | | | | | | | |
| 2859835320 | 84,965 | | | | | | | | | | | | | | | |
| 735013559 | | | | | | | | | | | | | | | | |
| 7063290196 | 22 | | | | | | | | | | | | | | | |
| 7063290196 | | | | | | | | | | | | | | | | |
| 8384620335 | 259,214 | | | | | | | | | | | | | | | |
| 465076651 | | | | | | | | | | | | | | | | |
| **Beg Book Cash** | 344,224 | 362,682 | 185,425 | 271,257 | 448,462 | 251,599 | (50,325) | (166,144) | (165,852) | (219,592) | (302,904) | (105,725) | 47,562 | (228,754) | 216,250 | 181,250 |
| | 344,224 | | | | | | | | | | | | | | | |
| **Sources** | | | | | | | | | | | | | | | | |
| MMFX A/R | 88,347 | 40,885 | 5,381 | 863 | 2,537 | 7,802 | 7,234 | 7,802 | 2,391 | 6,822 | 10,557 | 102,649 | 102,649 | - | - | - |
| Martinez Riverside | - | 35,000 | - | - | - | - | 35,000 | - | - | - | 35,000 | 35,000 | - | - | 35,000 | - |
| WFB APA Advance | 56,895 | 12,391 | 29,434 | 3,203 | 30,491 | - | - | 55,378 | - | - | - | - | - | - | - | - |
| APA Colateral | 12,391 | 29,434 | 3,203 | 3,203 | - | - | - | - | - | - | - | - | - | - | - | - |
| Investor Funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Value Added fee - Adelphic | 159,838 | 221,862 | 221,862 | 225,928 | - | - | - | - | - | - | - | - | - | - | 181,250 | 181,250 |
| **Total Sources** | 145,242 | 248,114 | 256,677 | 225,928 | 33,029 | 7,802 | 42,234 | 55,378 | 2,391 | 6,822 | 45,557 | 102,649 | 228,754 | 216,250 | 181,250 | 136,282 |
| **Post-Petition Uses** | | | | | | | | | | | | | | | | |
| Payroll | | 102,650 | 102,650 | - | 102,650 | 102,650 | 102,650 | 102,650 | 102,650 | 102,650 | 102,650 | 102,650 | 102,650 | 102,650 | 102,650 | 102,650 |
| Consultants | 126,784 | 6,150 | 4,270 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 | 7,650 |
| Employees | | 4,328 | 4,451 | 7,908 | 4,621 | 4,000 | 4,328 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| Finder's | | | | 4,997 | 5,150 | 6,150 | 4,997 | 6,150 | 5,011 | 6,150 | 6,150 | 6,150 | 6,150 | 6,150 | 6,150 | 6,150 |
| Freight | | | 7,227 | | 4,621 | 5,150 | 4,621 | 5,150 | 5,011 | 5,150 | 5,150 | 5,150 | 5,150 | 5,150 | 5,150 | 5,150 |
| Insurance | 547 | | | 7,908 | | 4,621 | 4,328 | 4,621 | 4,997 | 4,621 | 4,621 | 4,997 | 4,621 | 4,621 | 4,621 | 4,997 |
| Interest | | | 7,908 | 9,241 | 9,241 | 7,650 | 6,771 | 6,771 | 6,771 | 6,771 | 6,771 | 6,771 | 6,771 | 6,771 | 6,771 | 6,771 |
| Professional | | | | | 7,908 | 22,173 | 547 | 9,241 | 9,241 | 9,241 | 9,241 | 9,241 | 9,241 | 9,241 | 9,241 | 9,241 |
| Ch 11 Professional | | 250,000 | | | 250,000 | 250,000 | | 250,000 | 250,000 | | | | 250,000 | 250,000 | 250,000 | 22,173 |
| Rent | 416 | 416 | 104 | 9,000 | 748 | 5,000 | 6,771 | | | | | | | | | |
| Leases | 8,823 | 5,348 | 4,168 | 5,348 | 416 | 748 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 547 |
| Office | 109,089 | 5,467 | | 5,467 | 5,485 | 416 | 748 | 748 | 5,348 | 5,348 | 5,348 | 5,348 | 5,348 | 5,348 | 5,348 | 9,000 |
| Product | | | | | 4,472 | 5,485 | 416 | 416 | 748 | 748 | 748 | 748 | 748 | 748 | 748 | 5,348 |
| Intercol | | | | | 8,223 | 4,472 | 5,485 | 416 | 416 | 416 | 416 | 416 | 416 | 416 | 416 | 748 |
| Taxes | 12,146 | 475 | | 2,186 | | 8,223 | 5,467 | 5,485 | 5,485 | 5,485 | 5,485 | 5,485 | 5,485 | 5,485 | 5,485 | 416 |
| Utilities | 1,822 | | 2,603 | | 1,822 | | 4,472 | 4,472 | 4,472 | 4,472 | 4,472 | 4,472 | 4,472 | 4,472 | 4,472 | 5,485 |
| WFB APA Interest | | 7,500 | 7,500 | | | | 8,223 | 8,223 | 8,223 | 8,223 | 8,223 | 8,223 | 8,223 | 8,223 | 8,223 | 8,223 |
| **Total Post-Petition Uses** | 126,784 | 400,371 | 130,844 | 48,724 | 229,891 | 309,726 | 143,053 | 221,983 | 309,726 | 136,282 | 55,087 | 228,754 | 309,726 | 309,726 | 136,282 | 55,087 |
| **Other** | | | | | | | | | | | | | | | | |
| Moving expenses on new le | | | | | | | | | | | | | | | | |
| Inv Line repayment | | 25,000 | | | | | | | | | | | | | | |
| Other-Due Diligence | 25,000 | 25,000 | 15,000 | | 93,247 | | 15,000 | | | 15,000 | 15,000 | | 93,247 | 93,247 | 35,000 | |
| Other-Middle East | | | | | | | | | | | | | | | | |
| Caster storage | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | |
| **Total Other** | - | 25,000 | 40,000 | - | - | - | 15,000 | - | - | - | 15,000 | - | - | - | - | - |
| **Change in Cash** | 18,459 | (177,257) | 85,833 | 177,204 | (196,863) | (301,924) | (115,819) | (166,605) | (307,335) | (129,460) | (9,530) | (126,105) | (80,972) | (93,476) | 44,968 | 81,195 |
| **End Book Cash** | 362,682 | 185,425 | 271,257 | 448,462 | 251,599 | (50,325) | (166,144) | (165,852) | (219,592) | (302,904) | (105,725) | 47,562 | (228,754) | 216,250 | 181,250 | 55,087 |

**EXHIBIT B**

1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2       Including Professional Corporations
    ORI KATZ, Cal. Bar No. 209561
3   okatz@sheppardmullin.com
    Four Embarcadero Center, Seventeenth Floor
4   San Francisco, California  94111
    Telephone:  415-434-9100
5   Facsimile:   415-434-3947
    AARON J. MALO, Cal. Bar No. 179985
6   amalo@sheppardmullin.com
    650 Town Center Drive, 4th Floor
7   Costa Mesa, California  92626-1993
    Telephone:  714-513-5100
8   Facsimile:   714-513-5130
    CARREN B. SHULMAN (*admitted in New York*)
9   cshulman@sheppardmullin.com
    30 Rockefeller Plaza
10  New York, New York  10112
    Telephone:  212-653-8700
11  Facsimile:   212-653-8701

12  Proposed Attorneys for Debtor

13              UNITED STATES BANKRUPTCY COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15                  SANTA ANA DIVISION

16  In re:                              Case No. 8:10-bk-27571

17  MMFX STEEL CORPORATION
    OF AMERICA,                         Chapter 11
18
                      Debtor.
19                                      **ORDER APPROVING DEBTOR'S
                                        EMERGENCY MOTION FOR
20                                      INTERIM AND FINAL ORDER
                                        (I) AUTHORIZING POST-PETITION
21                                      FINANCING AND GRANTING
                                        LIENS AND SUPER-PRIORITY
22                                      CLAIMS, AND (II) PROVIDING
                                        RELATED RELIEF**
23

24

25

26

27

28

                              EXHIBIT B

1        The Court having reviewed the emergency motion for an order:

2  (a) Authorizing the Debtors to incur post-petition secured indebtedness (the "DIP

3  Financing") of up to $5 million on an interim and final basis, pursuant to a debtor-

4  in-possession loan agreement (the "DIP Credit Agreement") between the Debtors

5  and Lindsey Davidson ("DIP Lender"), pursuant to Sections 105, 361, 362 and 364

6  of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and

7  4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

8  and grant to DIP Lender a lien and security interest (the "DIP Lien") for the benefit

9  of the DIP Lender on all property of the Debtors (the "DIP Collateral"), other than

10 avoidance actions under Bankruptcy Code Sections 544, 545, 547, or 548; and (b)

11 Setting a final hearing on the this motion (the "Motion"),

12       THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:

13     A.    The Emergency Motion came on for hearing before this Bankruptcy

14 Court on the __ day of December 2010 at __:__ a.m., with notice thereof having

15 been given in accordance with Bankruptcy Rule 4001(c)(2) to:  (1) all agents and

16 secured creditors of the Debtors of whom the Debtors and its counsel have

17 knowledge; (2) the Official Creditors' Committee and/or all statutory committees

18 appointed by the United States Trustee (the "Committee") and/or the creditors

19 holding the 20 largest unsecured claims against the Debtors; and (3) the Office of

20 the United States Trustee; and (4) certain other significant parties in interest.

21     B.    Certain creditors and parties in interest made appearances on their own

22 behalf and/or through counsel as noted on the record, and expressed their opinions

23 on the Emergency Motion.  The Court has examined the Emergency Motion and is

24 entering this Order based upon the pleadings on file herein, and the arguments of

25 counsel at the hearing, and all other evidence presented to the Court.

26     C.    All capitalized words not otherwise defined in this Interim Order have

27 the meanings given for said terms in the DIP Agreement.

28

-2-

W02-WEST:3MAW1\403146699.1

D.    Debtors have requested that DIP Lender loan funds to Debtors (the "DIP Financing") pursuant to the terms and conditions set forth herein and in the DIP Credit Agreement, and all documents, instruments and agreements executed in connection therewith (collectively, the "DIP Documents").

E.    The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1), pursuant to Bankruptcy Code Sections 364(a), (b), (c) or on any basis other than the arrangement with DIP Lender.

F.    The secured credit to be provided under the DIP Credit Agreement is necessary to fund the business of the Debtors and to pay the actual and necessary costs and expenses of preserving the Debtors' estates in accordance with the Budget (defined below).

G.    The terms and conditions of the secured DIP Financing sought by the Debtors in the Emergency Motion, as set forth in the DIP Credit Agreement are, under the circumstances, the most advantageous currently available to Debtors. After considering all alternatives, and engaging in discussions with other potential lenders for debtor-in-possession financing, the Debtors have concluded, in the exercise of their best and reasonable business judgment, that the terms and conditions contained in the DIP Credit Agreement represent the best financing terms available to Debtors.

H.    DIP Lender has agreed to extend the DIP Financing on the terms and conditions contained in the DIP Credit Agreement and in reliance thereon, provided that this Court enters an order satisfactory to DIP Lender approving the DIP Credit Agreement and granting such liens, claims and priorities to DIP Lender as are set forth herein and in the DIP Credit Agreement.

I.    Based on the record presented to the Court by the Debtors, it appears that (i) the secured financing arrangement contemplated by the Emergency Motion and approved herein, pursuant to which post-petition loans will be made available to Debtors by DIP Lender, is entered into by DIP Lender in good faith as the term

-3-

1  "good faith" is used in Section 364(e) of the Bankruptcy Code, (ii) DIP Lender has

2  expressly relied upon the protections offered by Section 364(e) of the Bankruptcy

3  Code in extending such financing to Debtors, and (iii) in making decisions to extend

4  credit or enforce their rights under the DIP Credit Agreement, DIP Lender shall not

5  be deemed to be in control of the operations or properties of Debtors so as to subject

6  DIP Lender to any liability (including, without limitation, environmental liability).

7  Likewise, it appears that DIP Lender has adequately disclosed and apprised all

8  interested parties of current or past relationships with the Debtors.

9      J.    Notice of the Emergency Motion sufficient to satisfy the requirements

10  of Federal Rules of Bankruptcy Procedure ("FRBP") 2002 and 4001(c)(1), has been

11  given to the United States Trustee, the Committee, or if no Committee has been

12  appointed, the 20 largest unsecured creditors of Debtors, the appropriate Office of

13  the United States Trustee, all secured creditors and all parties otherwise entitled to

14  notice.  No further notice of the request for the relief granted in this Interim Order is

15  required.

16      K.    The terms and conditions contained in the DIP Documents are the

17  result of arms' length negotiations, and Debtors are receiving fair consideration and

18  reasonably equivalent value from DIP Lender for the obligations incurred and the

19  liens granted to DIP Lender.

20      L.    Good cause has been shown for the entry of this Interim Order.  Among

21  other things, pending confirmation of a plan of reorganization or the sale of some or

22  substantially all of the Debtors' assets, entry of this Interim Order will minimize

23  disruption of the Debtors' businesses and operations and permit them to meet payroll

24  and other operating expenses, obtain needed supplies and retain customer and

25  supplier confidence by demonstrating an ability to maintain normal operations. The

26  use of the DIP Financing authorized hereunder is vital to avoid immediate and

27  irreparable harm to the Debtors' estates.  The ability of Debtors to continue in

28  business so that they can attempt to reorganize under the Bankruptcy Code depends

W02-WEST:3MAW1\403146699.1

1  on obtaining the relief sought in the Emergency Motion and in this Interim Order.

2  Approval of the protections granted herein is therefore in the best interest of the

3  Debtors' estates.

4          M.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§

5  157(b) and 1334.  Consideration of this matter constitutes a core proceeding as

6  defined in 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought

7  herein are sections 105, 362, 363 and 364 of the Bankruptcy Code and Rule 4001(c)

8  of the Federal Rules of Bankruptcy Procedure.  Venue of these Chapter 11 cases and

9  the Emergency Motion seeking approval of this Interim Order in this District is

10  proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11          NOW, THEREFORE, BASED UPON THE FOREGOING, IT IS HEREBY

12  ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

13          1.     The Emergency Motion is hereby granted in all respects, and the DIP

14  Credit Agreement attached hereto as Exhibit "A" is hereby approved subject to the

15  terms and conditions set forth in this Order.

16          2.     Good and sufficient notice of the Emergency Motion's request for

17  approval of the DIP Financing and the other relief requested therein has been

18  provided in accordance with, inter alia, 11 U.S.C. §§ 102(1), 364(c), and FRBP

19  2002 and 4001(c), and any requirement for other and further notice shall be, and it

20  hereby is, dispensed with and waived.

21          3.     The Debtors are authorized to obtain secured indebtedness from DIP

22  Lender pursuant to the DIP Credit Agreement in an amount not to exceed

23  $1,500,000.00 (the "DIP Indebtedness") and to borrow and become obligated for all

24  borrowings, interest and fees from such available amounts under the DIP

25  Documents, and DIP Lender is authorized to disburse to Debtors, a total of

26  $1,500,000 from the DIP Indebtedness prior to the Final Hearing (defined below), if

27  such a hearing is held.

28

4.     The Debtors are expressly authorized and approved to execute, deliver, perform and consummate all of the terms and conditions set forth in the DIP Documents, and any and all other documents, instruments and agreements reasonably requested by DIP Lender to execute, effectuate, carry out, or consummate all of the terms and conditions set forth in the DIP Documents and this Interim Order. The Debtors are further authorized and directed to pay any and all fees, costs, charges and expenses, including counsel fees, payable under the DIP Documents. Such fees, costs, charges and expenses are hereby approved and deemed earned by DIP Lender upon entry of this Interim Order and the first advance by DIP Lender to Debtors pursuant to the terms of the DIP Documents and shall be promptly paid to DIP Lender in accordance with the DIP Documents.

5.     To secure the repayment of the DIP Indebtedness and any and all other obligations of Debtors to DIP Lender created by or arising under the DIP Documents, pursuant to Section 364 of the Bankruptcy Code, DIP Lender shall have, and is hereby granted an administrative expense claim equivalent in priority to a claim under Section 364(c)(1) of the Bankruptcy Code, with priority, subject to the limitations in this Section 8, superior to all other costs and expenses of administration of the kinds specified in, or ordered pursuant to, Sections 105, 326, 327, 328, 330, 331, 503, 506(c), 507, 726, or 1114 of the Bankruptcy Code or otherwise, and shall at all times, to the extent permitted by applicable law, be senior to the rights of Debtors or any successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Bankruptcy Code ("Super-Priority Claim").

6.     To further secure the repayment of the DIP Indebtedness the DIP Lender shall have, and is hereby granted a lien and security interest for the benefit of the DIP Lender on all property of the Debtors, other than avoidance actions under Bankruptcy Code Sections 544, 545, 547, or 548 (the "Post-Petition Liens").

7.    Any other provision of this Interim Order or the DIP Agreement to the contrary notwithstanding, the Post-Petition Liens and the Super-Priority Claim shall be subject to payment of:  (A) the allowed unpaid fees and expenses, payable or accrued under Bankruptcy Code sections 330 and 331 to the following professional persons retained in the Chapter 11 Case pursuant to an order of the Bankruptcy Court, including: Sheppard, Mullin, Richter & Hampton, LLP, as Debtor's counsel; provided, however, that the total of the combined payment to such professionals under this subparagraph (A) shall not exceed the amounts budgeted for professionals in the Budget (collectively, the "Carve-Out") absent further Order of the Court.

8.    The Post-Petition Liens in, on and to the Collateral granted by Debtors pursuant to this Interim Order and the financing arrangement set forth in the Emergency Motion are hereby deemed effective, valid and perfected as of the commencement of Debtors' bankruptcy cases, without the necessity of the filing by any person of any deeds of trust, mortgages, UCC financing statements, notices of liens and security interests, documents or other instruments otherwise required to be filed under applicable non-bankruptcy law for the perfection of security interests or mortgages, with such validity and perfection being binding upon any subsequently appointed Trustee, either in a Chapter 11 case or a case under any other Chapter of the Bankruptcy Code, and on any and all other creditors of Debtors who have or may hereafter extend credit to Debtors, or file a claim of any nature whatsoever, in this or any superseding Bankruptcy Case of Debtors.

9.    Commencing on the Petition Date, and consistent with the DIP Documents, Debtors are authorized to request and receive from DIP Lender the available balance of the DIP Financing (subject to the interim cap on such amounts identified above).

10.    Debtors shall, on or before December __, 2010, mail copies of a notice of the approval of this Interim Order, together with a copy of this Interim Order, to the parties having been given notice of the Emergency Motion and to any other

W02-WEST:3MAW1\403146699.1

1    party which has filed a request for notices with this Court and to counsel for any

2    Committee.  The notice of approval of this Interim Order shall state that any party in

3    interest objecting to this Interim Order as a final Order shall file written objections

4    with the United States Bankruptcy Court Clerk for the Central District of California

5    no later than _____ __, 2010.  Any other further obligation for notice of the relief

6    granted herein and of the final hearing on the Emergency Motion (the "Final

7    Hearing") shall be, and hereby is, dispensed with and waived.

8        11.    If no written objection is timely served and filed, this Interim Order

9    shall be deemed the Final Order on _____ __, 2010, and this Interim Order shall

10   continue on a final basis and remain in full force and effect and shall constitute final

11   authority for the balance of the DIP Financing, and any objection by any party in

12   interest to the terms of this Interim Order and the relief requested in the Emergency

13   Motion shall be deemed forever waived.  If a timely objection is served and filed, a

14   final hearing to consider the Emergency Motion will be held on _____ __, 2010 at

15   __:__ __.m.

16

17

18                                    ###

19

20

21

22

23

24

25

26

27

28

W02-WEST:3MAW1\403146699.1