1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2    Including Professional Corporations
   ORI KATZ, Cal. Bar No. 209561
3  okatz@sheppardmullin.com
   Four Embarcadero Center, Seventeenth Floor
4  San Francisco, California 94111
   Telephone:    415-434-9100
5  Facsimile:    415-434-3947
   AARON J. MALO, Cal. Bar No. 179985
6  amalo@sheppardmullin.com
   650 Town Center Drive, 4th Floor
7  Costa Mesa, California 92626-1993
   Telephone:    714-513-5100
8  Facsimile:    714-513-5130
   CARREN B. SHULMAN (*admitted in New York*)
9  cshulman@sheppardmullin.com
   30 Rockefeller Plaza
10 New York, New York 10112
   Telephone:    212-653-8700
11 Facsimile:    212-653-8701

12 Proposed Attorneys for Debtor

13                UNITED STATES BANKRUPTCY COURT

14                CENTRAL DISTRICT OF CALIFORNIA

15                     SANTA ANA DIVISION

16 In re:                              Case No. 8:10-bk-27571

17 MMFX STEEL CORPORATION OF           Chapter 11
   AMERICA,
18                                     **DECLARATION OF MICHAEL**
                   Debtor.            **POMPAY IN SUPPORT OF**
19                                     **DEBTOR'S FIRST DAY MOTIONS**

20                                     Date:  To Be Set
                                       Time:  To Be Set
21                                     Place: United States Bankruptcy Court
                                              411 West Fourth Street
22                                              Santa Ana, CA 92701
                                              Courtroom 5D
23                                     Judge: Hon. Robert Kwan

24

25

26

27

28

                                -1-

1    I, Michael W. Pompay, declare as follows:

2    1.    I am the President of MMFX Steel Corporation of America, a Nevada

3    corporation ("Steel Corp."). I am also the President of MMFX Technologies Corporation,

4    a California corporation ("Technologies"), and the Corporate Secretary of Fasteel

5    Corporation, a California corporation "Fasteel") (the Debtor, Technologies, and Fasteel are

6    referred to collectively in this declaration as the "Debtors"). I am familiar with the

7    Debtors' day-to-day operations, business affairs and books and records. Except as

8    otherwise indicated, all statements in this Declaration are based on my personal

9    knowledge, my review of relevant documents or my opinion based upon my experience

10    and knowledge of the Debtors' operations and financial condition. If I were called upon to

11    testify, I could and would testify to each of the facts set forth herein based on such

12    personal knowledge, review of documents or opinion. I am authorized to submit this

13    Declaration on behalf of the Debtors.

14    2.    I submit this declaration in support of the Debtors' first day motions,

15    including the Debtors' *Ex Parte* Applications for Order Authorizing Joint Administration

16    of Related Chapter 11 Cases (the "Joint Administration Applications"), the Debtors'

17    Emergency Application for Order Limiting Service of Notice of Certain Matters Pursuant

18    to Federal Rule of Bankruptcy Procedure 2002(i) (the "Limit of Service Application"), and

19    the Debtors' DIP Financing Motions.

20

21    **Background of Cases**

22    3.    Technologies was formed on June 22, 1998 for the purpose of acquiring and

23    holding valuable patents in the field of nanotechnology. Its first acquisition was a group of

    patents from the University of California, Berkley in the first stock only technology

24    transfer ever made by the University. These proprietary micro- and nano-technologies

25    enable the manipulation of the microstructures of materials (primarily steel) to obtain

26    optimum microstructural properties. In short, as set forth in greater detail below, the

27

28

technology allows Technologies to produce steel ("MMFX Steel") that is stronger, more flexible, corrosion resistant, ecologically sound, and economical than standard steel.

4.    In its effort to commercialize the technology, Technologies formed a number of subsidiaries (all referenced hereinafter as the "MMFX" or the "Company"), including the following:

- Fasteel, created in August 2000, to handle the research, development, application and testing of MMFX Steel and related materials under various conditions to test stress, corrosion and the like;

- Steel Corp, created in September 2001, to handle the fabrication and sale of concrete reinforcing steel;

- MMFX Canadian Holdings, Inc. ("Canadian Holdings"), created in March 2006, to hold 100% of the stock of certain Canadian subsidiaries, which in turn operated a steel mill in Canada and owned certain related real estate and equipment in Canada.

- MMFX International Holdings, Inc. ("MMFX International"), created in May 2008, to act as a holding company for the foreign companies, including Canadian Holdings.   In May 2009, MMFX International also held 100% of the stock of MMFX Steel DMCC ("DMCC") which operates in the Middle East. DMCC was formed under the laws of the United Arab Emirates and is licensed to conduct business as a member of the Dubai Multi Commodities Center to serve and supply the Middle East region with steel products and to provide service to engineers, contractors and sales personnel throughout the region.

5.    Currently, Canadian Holdings and MMFX International are debtors in a jointly administered bankruptcy proceeding, filed on January 5 2010, pending before this Court, under Case Nos. 10-10083-RK and 10-10085-RK and are the parent entities of Canadian subsidiaries (the "Canadian Parents").   Technologies holds seven main U.S.

patents and has filed for patent protection in approximately 50 countries/regions for a total of approximately 350 patent applications relating to MMFX's steel.

6.    Until May 2008, Technologies successfully financed its operations with $67 million in equity capital contributed by the current shareholders.

7.    MMFX operates as a consolidated business and all decision making for is centralized in Irvine, California.

### The MMFX Steel Product

8.    MMFX Steel is five times as corrosion-resistant and up to three times as strong as conventional, or as it is commonly called in the industry, "black" steel. MMFX Steel has a completely different structure at the nano, or atomic, scale than black steel. MMFX Steel, as a result of its composition and the processes it undergoes, creates a laminated lath structure resembling "plywood" at the molecular level, thus creating the structural strength present in plywood as compared to natural wood. This "plywood " structure gives MMFX Steel its superior strength, ductility, toughness and corrosion resistance.

9.    Steel manufactured with MMFX Technologies' proprietary technology has the potential to change the way the industrialized world uses steel. MMFX Steel allows high-rise construction with less steel and concrete than traditional steel, which reduces construction costs and the environmental impacts associated with steel and concrete production. Because MMFX Steel is extremely corrosion resistant, it has the potential to greatly reduce future replacement costs. The U.S. Federal Highway Administration currently estimates that it will cost $429 billion to fix the infrastructure corrosion problems currently facing the United States. This amount represents approximately 3.5% of the United States' GDP. MMFX Steel has the potential to significantly reduce future replacement costs, resulting in substantial savings for future generations.

10.    MMFX is well positioned to gain the global market's acceptance for its proprietary products from nearly all important market sectors. The utility of MMFX Steel

-4-

1   for the building of infrastructure has been verified by numerous public agencies and

2   universities.  MMFX Steel's characteristics have been recognized by all 50 state

3   Departments of Transportation (the "DOTs") and, most notably, by the Virginia

4   Department of Transportation, which now mandates use of MMFX Steel for all of its

5   bridge construction.  In fact 24 state Departments of Transportation have approved the use

6   of MMFX Steel for construction of bridges and highways.  MMFX Steel is typically

7   produced by third party mills under contract for use by US entities due to "Buy American"

8   policies of the US state and federal government.

9          11.    MMFX Steel is also increasingly used in the high rise construction market.

10  Numerous cities and counties in the U.S. have approved the use of MMFX Steel for high

11  rise construction, including San Diego, Long Beach, Los Angeles and Irvine, California,

12  Seattle, Washington, Las Vegas Clark County, and Miami, Orlando, and McDade counties

13  in Florida.  MMFX has also gained wide acceptance in the Middle East market,

14  particularly in Abu Dhabi due to its reclaimed salty and sandy soil, which normally

15  accelerates corrosion problems, making use of MMFX Steel very attractive.

16         12.    Currently, MMFX produces both traditional black and MMFX Steel, and is

17  increasing its market share over manufacturers of "black" steel on DOT projects.  MMFX

18  also sells its steel to DMCC for the Middle East projects, as well as to third party buyers.

19         13.    As of December 13, 2010, MMFX collectively employed approximately 30

20  employees worldwide, of which 19 are in California.  Due to the acceptance of MMFX

21  Steel by the state DOTs and MMFX's increasing market share in DOT projects, MMFX

22  has doubled its sales from September to October, and again from October to November.  In

23  November, MMFX shipped more than 2,700 tons in fulfillment of sales orders of more

24  than $4.5 million.

25                     **Incurrence of Debt for the Welland Mill**

26         14.    In April, 2006, MMFX acquired a steel mill in Welland, Ontario (the

27  "Welland Mill"), along with real estate (including office space) and equipment, from

28  entities that had no affiliation to MMFX.  The purchase of the Welland Mill was expected

-5-

1  to allow MMFX to manufacture MMFX Steel itself, without having to outsource any

2  aspect of the manufacturing to a third party.  MMFX created Welland Real Estate Inc., ST

3  Equipment Inc., and MMFX Steel of Canada Inc. (together, the "Canadian Subsidiaries")

4  to hold the Canadian assets, each of which was organized under the laws of British

5  Colombia.

6      15.    Following an outlay of approximately $30 million in capital expenditures to

7  achieve commercial start-up, the Welland Mill became operational in January 2009.

8      16.    In order to fund part of the capital expenses to achieve the commercial start

9  up of the Welland Mill, certain MMFX and its subsidiaries entered into a credit agreement

10  dated as of May 30, 2008 with Fourth Third LLC, as lender ("Fourth Third") and Welland

11  Security Holding Corporation, as collateral agent pursuant to which Fourth Third advanced

12  a term loan in the aggregate principal amount of $55 million to MMFX subsidiaries in

13  Canada (the "Fourth Third Loan").  The Fourth Third Loan was guaranteed by

14  Technologies, Steel Corp, Fasteel, Canadian Holdings and MMFX International on an

15  unsecured basis.

16      17.    The acquisition of the Welland Mill was financed in part by the issuance by

17  Technologies of a $5 million convertible secured note, with an additional $5 million

18  payable at maturity to Investment Funding, Inc ("Investment Funding", and the

19  "Investment Funding Note").  The Investment Funding Note was secured by all of the

20  equipment, machinery and trade fixtures at the Welland Mill.

21      18.    In the Fall of 2008, an unanticipated and disastrous series of events began

22  which led to the collapse of worldwide markets in nearly every industry, including

23  manufacturing, construction and retail sales.  Public and private construction projects in

24  the United States and abroad came to a halt and suddenly no one was in the market for

25  steel, but for a few projects nearing completion.  Production at the Welland Mill ceased in

26  June 2009 and the mill was idled.  During the period from January to September 2009, the

27  Welland Mill sold off 11,481 tons of black and MMFX Steel billet to DMCC, MMFX

28  Steel and third party buyers, resulting in revenues of approximately CAD$4,400,000.

W02-WEST:3MAW1\403146701.1

**MMFX's Reasons for Filing**

19.     MMFX's current financial crisis is attributable primarily to a combination of market factors.  The global financial crisis, which remains most severe in the real estate sector, has significantly reduced demand for new construction for high-rise buildings.  The absence of new construction projects directly affects the demand for steel.  The decrease in the demand for steel led in turn to the unanticipated and precipitous decline in the market price of steel, which has declined by more than 50% in the last 12 months.  Most traditional steel mills in North America are operating at 50% capacity.  Other factors which have depressed domestic steel prices in the last several years are first, the availability of inexpensive foreign steel and second, the surplus of inventory currently held by consumers and steel service centers.

20.     Given the lack of orders, the Welland Mill was temporarily idled in June 2009 to reduce indirect overhead costs.  The paucity of orders for steel left the Canadian Subsidiaries without the cash flow necessary to service both the $60 million in secured loans and their operations.

21.     In or about August 2009, MMFX was in breach of a covenant under the Fourth Third Loan and after several failed attempts at renegotiating the loan, MMFX sought bankruptcy protection in Canada on January 6, 2010 under the Companies Creditors Arrangement Act ("CCAA") for the Canadian Subsidiaries.  MMFX also filed the cases for the Canadian Parents before this Court.  At the time of the CCAA proceeding, the total outstanding debt to Fourth Third was $55,000,000 in principal, plus $3,169,000 in accrued interest.

22.     Shortly after the commencement of the CCAA, in March, 2010, MMFX entered a debtor-in-possession financing agreement with Fourth Third (the "Canadian DIP Loan") to borrow sufficient funds to run a sale process for the assets of the Canadian Subsidiaries (the "Canadian Asset Sale").  The sale auction occurred on July 20, 2010, and Fourth Third was the successful bidder after entering a credit bid of CAD $32,800,000 (the "Credit Bid").  At the time of the sale, the Canadian DIP Loan was CAD $3,800,000.

W02-WEST:3MAW1\403146701.1

23.     With the assets of the Canadian Subsidiaries sold to Fourth Third, the security for the Fourth Third Loan and the Investment Funding Note was gone.  Fourth Third is left with an unsecured claim against the guarantors, Technologies, Steel Corp. and Fasteel, for the balance of its debt, and Investment Funding with an unsecured claim against Technologies for the amount of its debt.

24.     Following the closing of the Canadian Asset Sale, Fourth Third asserted a deficiency claim against MMFX in an amount in excess of $49 million, significantly more than the outstanding debt to Fourth Third after application of the Credit Bid and payment of the Canadian DIP Loan.  MMFX disputes the claim and filed an objection to Fourth Third's proof of claim in the MMFX International case, which includes an objection on the basis that a certain "Make-Whole Premium" of over $13 million triggered upon the filing of the MMFX International case violates the Bankruptcy Code and related case law.

25.     On or about August 25, 2010, Investment Funding obtained a Temporary Protective Order in a proceeding encaptioned *Investment Funding Corporation v. MMFX Technologies Corporation*, pending in the California Superior Court in and for the County of San Diego, Case No. 37-2010-00098635-CU-BC-CTL.  Investment Funding asserts that it has a lien over the assets of Technologies and seeks payment of $5 million, plus a $5 million premium.

26.     On or about October 20, 2010, Fourth Third obtained a right to attach order in a proceeding encaptioned *Fourth Third, LLC v. MMFX Technologies Corporation*, pending in the Superior Court of California in and for the County of San Diego, Case No. 37-2010-00102068-CU-CO-CTL.  Fourth Third asserts that it has a lien over assets of MMFX.

27.     In order to give MMFX, Investment Funding and Fourth Third the flexibility to negotiate the terms of an appropriate resolution to claims, on or about November 17, 2010, the parties entered a lien release agreement (the "Lien Release Agreement") whereby Investment Funding and Fourth Third agreed any alleged liens will be deemed released automatically upon the filing by MMFX on or before December 14, 2010 of a voluntary

-8-

petition for relief under chapter 11 title 11 of the United States Code (the "Bankruptcy Code"), if at the time of such filing, no other liens shall have attached to MMFX assets, and MMFX shall have taken no action to increase the amount of any secured debt. MMFX meets each of these conditions. In addition, both Fourth Third and Investment Funding have agreed to forbear through and including December 13, 2010 from exercising any rights and remedies it may have against MMFX.

28. Between November 17, 2010, and December 14, 2010, MMFX pursued opportunities to pay off Fourth Third and Investment Funding and has presented opportunities as they arise to those parties, which include payment of the true amount of the debt to Fourth Third and Investment Funding, plus a capital infusion and retention of some equity for current shareholders. Simultaneously, Fourth Third presented a confidential term sheet with economic terms that were less desirable than other offers. Additionally, in the past few days, MMFX has begun to receive expressions of interest in licensing of the technology for MMFX Steel that, if successful, would allow MMFX to repay the debt of Fourth Third and Investment Funding.

29. With no final deal in place, and the approaching deadline under the Lien Release Agreement, MMFX has no choice but to file for protection under the Bankruptcy Code in order to ensure that it is able to take advantage of the highest and best offer for the creditors of the estate, as well as the equity holders.

**Key Agreements With Adelphia and Wells Fargo**

30. Certain of the Debtors are parties to key agreements with Adelphia Metals, LLC and Wells Fargo Bank. Those agreements are summarized below.

31. As part of Steel Corp.'s usual sales fulfillment process, Steel Corp. purchases concrete reinforcing steel from Cascade Steel Rolling Mills ("Cascade"), which operates out of McMinville, Oregon. Steel Corp. receives the steel from Cascade in Steel Corp.'s Longview, Washington steel processing plant (the "Longview Facility") and works with that material to turn it into products ordered by Steel Corp.'s customers ("Products"). Steel Corp. entered into the Sales Order Assignment Agreement (the "Agreement") with

-9-

1  Adelphia Metals, LLC ("Adelphia") in order to obtain the working capital it needs to

2  satisfy customer orders for Product.

3      32.      Steel Corp. receives Sales Orders ("SO's") for Product from its customers.

4  Under the terms of the Agreement, Steel Corp presents to Adelphia those of the SO's that

5  are available for assignment.  To the extent that Adelphia approves the SO's (and the

6  Agreement does not identify what criteria should be consulted in determining which SO's

7  are approved) Steel Corp. assigns the SO's to Adelphia pursuant to a form document, and

8  Steel Corp is obligated to inform the customer that:  (1) the assignment occurred; and (2)

9  Adelphia will be invoicing the customer for the Product it ordered from Steel Corp.

10     33.      Despite the above-referenced assignment, Steel Corp. remains responsible

11  for fulfilling the SO's and delivering the Product to customers.  Steel Corp. is also required

12  to negotiate with Cascade for the purchase of such steel materials as are required for Steel

13  Corp. to satisfy each assigned SO, and upon the completion of that negotiation process,

14  Adelphia issues a Purchase Order to Cascade ("Cascade PO") to cover the materials

15  identified by Steel Corp.  Adelphia pays for the materials described in each Cascade PO by

16  wire transfer approximately four weeks before Cascade manufactures the materials ordered

17  by Steel Corp.

18     34.      Steel Corp. receives the materials produced by Cascade in the Longview

19  Facility.  At the Longview Facility such materials as have been purchased to satisfy the

20  SO's are segregated from the rest of Steel Corp's materials, and are marked as owned by

21  Adelphia.  Despite this, Steel Corp. processes the materials in order to generate the Product

22  required to satisfy the SO's.

23     35.      Adelphia invoices Steel Corp.'s customers directly for the Product they order,

24  on net 30 terms.  As noted above, Steel Corp is responsible for receiving the materials

25  needed to generate this product, processing those materials, and delivering the Product to

26  customer.  In return for these services, Adelphia pays Steel Corp 95% of the SO price,

27  reduced by the cost of the Cascade PO generated in connection with the satisfaction of that

28  SO.

W02-WEST:3MAW1\403146701.1

36.     MMFX Steel and Wells Fargo Business Credit ("WFBC") entered into that certain Account Purchase Agreement (the "Agreement") on or about January 10, 2008. Pursuant to the Agreement, MMFX sells certain acceptable accounts receivable to WFBC with limited recourse obligations.  The Agreement provides that WFBC will pay MMFX a price for each sold account that represents 80% of the face value of the account, adjusted downward by a specified percentage that varies based upon the total volume of accounts MMFX sells to WFBC during the preceeding 2 month period.  At the high end (in the event that the 2 month period resulted in the sale of less than $1,000,000) the discount applied to the purchase price is 1.00% for accounts that are 20 days old or less, with an additional .05% discount applied to the purchase price for accounts 21 days old and over. At the low end (If MMFX sells more than $3,000,000 in accounts to WFBC during any given two month period) the discount applied to the purchase price paid to MMFX is reduced to .67% for accounts that are 20 days old or less, and a slightly higher discount is applied to accounts that are 21 or more days old.  Payments owed to MMFX under the Agreement are due and payable upon completion of each assignment to WFBC.  Wells Fargo has filed a UCC financing statement covering various collateral, including MMFX Steel's accounts, in connection with the Agreement.

**Background Facts Relating to Joint Administration Application**

37.     On January 5, 2010, both Canadian and International commenced chapter 11 cases by filing voluntary petitions for relief under title 11 of chapter 11 of the Bankruptcy Code.

38.     Canadian's and International's cases are currently jointly administered.

39.     On December 13, 2010, the Debtor commenced its chapter 11 case by filing a voluntary petition for relief under title 11 of chapter 11 of the United States Code (the "Bankruptcy Code").

40.     On December 13, 2010, both Steel Corp. and Fasteel commenced their chapter 11 cases by filing voluntary petitions for relief under title 11 of chapter 11 of the Bankruptcy Code.

-11-

1       41.   The Debtors continue in possession of their respective estates and are

2 operating and managing their businesses as debtors-in-possession pursuant to §§ 1107 and

3 1108 of the Bankruptcy Code.

4       42.   Technologies owns 100% of the interest in Steel Corp., Fasteel, and

5 International. International owns 100% of the interest in Canadian. Each of the entities

6 are "affiliates" as that term is defined under § 101(2) of the Bankruptcy Code.

7       43.   The Debtors each share the same primary creditor, Fourth Third LLC

8 ("Fourth Third"), by virtue of the Debtors' guarantees of certain Fourth Third's loans to

9 International and Canadian, which loans were guaranteed by the Debtor, Steel Corp, and

10 Fasteel.

11       44.   The Debtors will be represented by the same chapter 11 counsel. Although it

12 is expected that the Debtors will file a joint reorganization plan, each Debtor will file

13 separate creditor matrices, schedules, statements of financial affairs, and monthly

14 operating reports. In addition, the Debtors will request that proofs of claim be filed under

15 the case number of the applicable Debtor.

16       **Background Facts Relating to Limit of Service Application**

17       45.   As of the Petition Date, Technologies had in excess of 50 parties to be served

18 in this case. Steel Corp. had in excess of 100 parties, and Fasteel had numerous parties to

19 be served. Providing notice of all matters identified in Bankruptcy Rule 2002 to all

20 creditors and interested parties in this case would be costly and time-consuming.

21

22       I declare under penalty of perjury under the laws of the United States of

23 America, that the foregoing is true and correct. Executed this 14th day of December 2010

24 at Irvine, California.

25                   Michael W. Pompay

26

27

28

W02-WEST:3MAW1\403146685.1